# Exhibit 1



## KIOSK OPERATING AGREEMENT
### Summary Page

| | |
|---|---|
| **Client:** | 7-Eleven, Inc. |
| **Primary Client Contact:** | Mark Hagen; mark.hagen@7-11.com; 972-828-7747 |
| **Form of Organization:** | A corporation organized under the laws of the state of Texas |

| **Client Addresses:** | *Principal Address* | *For Notices:* |
|---|---|---|
| | 7-Eleven, Inc. | Same |
| | 1722 Routh Street | |
| | Suite 1000 | |
| | Dallas, Texas 75204 | |

| | |
|---|---|
| **Effective Date:** | January 1, 2015 |
| **Initial Term:** | 2 years beginning on January 1, 2015 and expiring on December 31, 2016. Thereafter, this contract will renew in accordance with Section 9.1(b). |
| **Placements:** | ☒ Indoor                ☒ Outdoor |
| **Commission:** | 10.75% per Kiosk for DVD rental; 8.5% per Kiosk for video game rental; 3% per Kiosk for Sell Through and Previously viewed Sell Through.  Commission payment is calculated in accordance with Section 7. |
| **Products:** | ☒ DVD Rental |
| | ☒ DVD Sell Through |
| | ☒ DVD Previously-Viewed Sell Through |
| | ☒ Video Game Rental |
| | ☒ Video Game Sell Through |
| | ☒ Video Game Previously-Viewed Sell Through |
| **Issuance of Commission Payments:** | Monthly |
| **Cancellation of Prior Contracts:** | This contract, on and after its Effective Date, supersedes and cancels the prior contracts (except with respect to any outstanding payment obligations) identified as follows: |

Kiosk Operating Agreement dated October 24, 2008; First Amendment to Kiosk Operating Agreement dated April 17, 2009; Second Amendment to Kiosk Operating Agreement dated August 11, 2009; Video Game Addendum dated June 1, 2011; Tickets Pilot Program Addendum dated August 17, 2012 and Amended Tickets Pilot Program Addendum dated January 7, 2013.

**7-ELEVEN, INC.**

By: _Jesus Delgado Jenkins_
Name: JESUS DELGADO – JENKINS
Title: EVP + CHIEF MERCH OFFICER
Date: JAN, 27, 2015

**REDBOX AUTOMATED RETAIL, LLC**

By: _[signature]_
Name: KARYN ARONSON
Title: VICE PRESIDENT – FINANCE
Date: 1-15-15

APPROVED BY
REDBOX LEGAL
F.S.

ATTEST: _[signature]_

L50115

# KIOSK OPERATING AGREEMENT

## Contents

1. Definitions

2. Nature of Our Agreement

3. Identification of Sites and Premises

4. Kiosk Installation

5. Kiosk Operation and Maintenance

6. Kiosk Relocation, Removal and Re-Installation

7. Commission Payments

8. Marketing

9. Term and Termination

10. Confidential Information

11. Assumption of Loss; Insurance

12. Indemnification

13. Limitations of Liability

14. Miscellaneous

This Kiosk Operating Agreement (this "contract") is entered into between 7-Eleven, Inc., a Texas corporation on its own behalf and on behalf of its franchisees ("you," "your" or "Client") with its principal offices at 1722 Routh Street, Suite 1000, Dallas, Texas 75204 and Redbox Automated Retail, LLC, a Delaware limited liability company ("we," "our" or "Redbox"), with its principal offices at One Tower Lane, Suite 900, Oakbrook Terrace, Illinois 60181. The term "us" refers to both Client and Redbox. The contract consists of the Summary Page, the following terms and conditions, and the exhibits to the contract.

## Terms and Conditions

### 1. Definitions

"Commissions" refers to the sums payable to you under this contract, as detailed in the Section entitled "Commission Payments."

"Effective Date" means January 1, 2015.

"Kiosk" means a Redbox® branded machine that vends Media (a) selected by a customer on the Kiosk's touch screen monitor (b) after the presentment of a valid payment card accepted by Redbox. The Kiosk also has a card reader, a lighted panel for displaying Media cover art that is mounted on the side of the Kiosk, and may have a flat screen video monitor mounted above the Kiosk to play promotional or advertising materials. The Kiosk specifications are substantially similar to those displayed on Exhibit "A."

"Media" means DVD movies (in both standard and Blu-ray formats) and video games in their physical form as opposed to downloadable DVD movies or video games.

"Premises" means prominent and visible space measuring approximately three (3) feet by seven (7) feet in a mutually agreed, strategic location at each Site, together with non-exclusive access rights over, upon and across those areas designated by Client and Redbox for the installation, operation, maintenance and repair of the Kiosks.

"Sites" means all corporate owned and operated 7-Eleven convenience stores, and all 7-Eleven convenience Stores operated by franchisees within the United States, together with all additional locations acquired or controlled by you after the Effective Date.

### 2. Nature of Our Agreement

2.1 **Kiosk Deployment.** Redbox operates automated Kiosks offering customers a convenient way to rent or buy Media, and an efficient way for you to generate income from your Premises. You have requested, and we have agreed, that Redbox will install and operate Kiosks at eligible Sites. You grant Redbox the right of first refusal to install and operate automated media rental and sales machines, and to rent Media, at your Sites. In return, Redbox will pay you the Commissions detailed in the Section entitled "Commission Payments." Redbox's right of first refusal to install and operate a Kiosk at an existing, new or newly acquired Site will terminate as to the Site upon Redbox's election not to install or operate a Kiosk at the Site or sixty (60) days after Client's written request for Redbox to install and operate a Kiosk at the Site, whichever occurs first. Once Redbox's right of first refusal to install and operate an automated media rental and sales machine at the terminated Site.

2.2 **Access to Sites.** You grant Redbox (for its use and the use of its employees and agents) a limited license over your Sites when the Sites are open to the public for business. This license allows Redbox to enter and exit the

150115

Sites, and to perform any necessary installation, service, maintenance, repair, relocation and removal of the Kiosks. You will not cause or permit any unreasonable interference to or from the Kiosks.

**2.3    Ownership of Kiosks and Media.** As between the two of us, you acknowledge that we own all right, title and interest in the Kiosks and the Media. You will not interfere with our ownership.

**2.4    Compliance with Law.** We will comply with all federal, state and local laws and regulations with respect to the installation and operation of the Kiosks, including but not limited to the Americans with Disabilities Act. You will maintain the area immediately surrounding the Premises in compliance with all applicable laws, codes, ordinances, rules and regulations (including without limitation the Americans with Disabilities Act and all related laws, ordinances and regulations, whether federal, state and local).

## 3.    Identification of Sites and Premises

**3.1    Site Identification.** The parties have previously identified eligible Sites on Exhibit B.

**3.2    Site Eligibility.** To be eligible for the installation of a Kiosk, a Site must be within a feasible Redbox Kiosk service area, as defined by Redbox, support Redbox's model for economic viability and be accessible to individuals pursuant to the requirements of the Americans with Disabilities Act of 1990 ("ADA"). If a Site does not meet these criteria, then we may, but will not be obligated to, install a Kiosk at the Site.

**3.3    Selection of Premises.** After identifying the Sites, the parties will work together to select Premises at the Sites to install the Kiosks. The order of installing Kiosks and the selection of Premises are largely determined by satisfying the goals of maximizing foot traffic, visibility, revenue and Commissions.

**3.4    Permits.** At our expense, the parties will work together to obtain any necessary permits, licenses or other governmental authorizations.

**3.5    New and Newly Acquired Sites.** You will use good faith efforts to provide Redbox throughout the term with a rolling forecast of your projected openings to determine eligibility according to section 3.2 above.  However, notwithstanding any other provision in this contract, we are not obligated to install a Kiosk at a new or newly acquired Site.  Installation at a new or newly acquired Site will be by mutual agreement.

**3.6    Installation and Access Authority.** Subject to applicable law, regulation, or the terms of any agreement for any new Site (which is in effect prior to the time you own or operate the new Site), you represent and warrant that you have the authority (a) to grant Redbox the right to install and operate Kiosks at the Sites; (b) bind your franchisees to the terms and conditions of this contract;  and (c) to grant access to Redbox, and its invitees, from and to the Kiosks so we can perform our obligations under this contract.

## 4.    Kiosk Installation

**4.1    Our Installation Responsibilities.** We will install Kiosks at the Sites according to a mutually agreed deployment schedule and in accordance with Exhibit C. Kiosk specifications are substantially similar to those described in Exhibit A. We will try to minimize disturbances to your Site operations during our installation of the Kiosks. For security reasons, we may bolt an outdoor Kiosk to the pavement.

**4.2    Your Preparation of the Premises.** Before the scheduled date of Kiosk delivery, you will prepare the Premises for installation by removing any structures, machinery, or displays located on the Premises. Due to the potential variation of deployment options, any additional preparation of a Site for the deployment of an outdoor Kiosk will be determined following a Site visit by Redbox personnel.

**4.3    Utilities.** With the exception of electrical power, our Kiosks normally have "plug and play" capability. Before the scheduled date of Kiosk delivery, you will provide two (2) electrical outlets from a dedicated circuit providing 110 volt, 20 Amp A.C. electrical power service to operate the Kiosk.  If an electrical outlet must be installed for this purpose, we will pay for and install the outlet. We will deduct the installation cost, less $250 for each installation, from your commission payment(s). We are responsible for communication or data connectivity.

## 5.    Kiosk Operation and Maintenance

**5.1    Our Responsibilities.** We have exclusive rights over the operation, use and control of the Kiosks, including but not limited to their hardware and software. Your personnel have only the same limited right of access to the Kiosks as are granted to the general public. At our sole cost and expense, we will provide all hardware and software support, maintenance and repairs for the Kiosks. We will maintain the Kiosks in an attractive and good state of repair, and in proper working order. If there is a Kiosk malfunction, we will promptly initiate diagnostic and repair services after receiving notice of the malfunction. The Redbox personnel assigned to perform Redbox's obligations under this contract will be qualified for the services they are assigned to perform. They will perform Redbox's obligations with promptness and diligence, and in a good and workmanlike manner.

**5.2    Your Responsibilities.** You will maintain the area immediately surrounding the Premises in a neat, clean and good condition, so as to provide an attractive and suitable environment for the use of the Kiosks by customers. You will provide all electrical service. For indoor Kiosk locations, you are responsible for heating and air conditioning services.

**5.3    Security and Access to Stores.** Each of us will take reasonable precautions to ensure safe working procedures and conditions during and in connection with such our operations at a Site. While on-Site, Redbox's personnel will comply with your security and access policies as may be in effect (and as are identified or provided in writing to Redbox) at the Sites. At your request, our personnel will check in with Site management when they arrive to perform maintenance or operations at a Site.

150115

**5.4 Customer Queuing.** You will keep the area immediately adjacent to the Premises open so individuals waiting to use the Kiosks may queue. Of course, you may direct such queuing so as to minimize interference with your other business traffic.

**5.5 Customer Service.** We will maintain a toll free customer service phone number which will be prominently displayed on the Kiosk. We will handle all customer calls and other issues relating to the operation of the Kiosks, providing not less than seventy (70) hours of live phone coverage across seven (7) days/week, excluding holidays, and 24 x 7 voice mail coverage.

**5.6 PCI Requirements.** Redbox will comply with the Payment Card Industry ("PCI") Data Security Standards requirements for cardholder data as issued by Visa/MasterCard, as they may be amended from time to time. Redbox shall provide you with written certification of PCI compliance within 30 days of the Effective Date and thereafter, once every year during the term

## 6. Kiosk Relocation, Removal and Re-Installation

We understand that, under certain circumstances, a Kiosk may need to be moved or relocated. This Section details the procedures governing movement and relocation of a Kiosk.

**6.1 Movement of a Kiosk.** It is critical that only Redbox – and not you – physically moves a Kiosk. Redbox needs to handle any move for several reasons, including: (a) the Kiosk is our property; (b) the Kiosk contains sensitive electronic equipment and precision machinery; (c) the Kiosk needs to remain powered and have consistent internet connectivity to conduct transactions, monitor inventory and status, and to receive programming updates; (d) due to its size, weight, and various components, the Kiosk requires specialized equipment for handling by trained personnel to prevent damage to and shifting of contents, personal injury, unnecessary service calls and lost revenue; and (e) because a sub-optimal location may result in less revenue, the new location must be mutually agreed upon between us. You agree to communicate these points to your personnel.

**6.2 Process for Movement, Relocation and Reinstallation of a Kiosk.** The agreed-upon process for relocation, removal or reinstallation ("3R") of Kiosks is as follows:

(a) You must request in writing the relocation, removal or reinstallation of any Kiosk by submitting your request to Redbox no less than five (5) business days prior to the requested relocation, removal or reinstallation date.

(b) Because Kiosk location is by mutual agreement, we will promptly respond with our agreement or disagreement as to the proposed Premises. Any relocated placement must be similar to the original location. In the unlikely event that the parties cannot agree on new Premises at a Site, then either party may terminate this contract with respect to that Site.

(c) Once the parties reach agreement on relocation,

removal or reinstallation, we will coordinate with your representative at the Site and will mutually determine the schedule (date and time) for it to take place. We – and not you – are responsible for the relocation, removal or reinstallation of the Kiosk.

(d) Notwithstanding anything in this contract to the contrary, during the term, you have the right with respect to any one or more Sites to terminate this contract with respect to those Sites, in the event you (i) sell, or otherwise dispose of any such Site , or (ii) determine that any such Site (s) will be closed for business; or (iii) a participating franchisee is terminated or the franchise agreement expires and the franchise relationship does not continue; or (iv) the operation of the Kiosk at the Site violates any law or ordinance and the violation cannot be cured at your reasonable expense. The decision to sell, close or otherwise dispose of any Site shall be in your sole and absolute discretion. Any such Site shall cease to be a Site for all purposes under this contract and the parties will agree on a date and time at which Redbox shall be permitted to enter the affected Site and remove the Kiosk or other materials owned by Redbox, which time and date shall in no event be later than the date that 7-Eleven (or its franchisee) no longer has control over the premises and shall give Redbox at least a thirty (30) day window during which to perform the removal at its sole cost and expense. In the event Redbox fails to remove the Kiosk or other materials within the timeframe the Parties agree upon for such removal, 7-Eleven or the third Person transferee of such Store shall have the right to remove and store such Kiosk or materials at Redbox's sole cost and expense.

(e) Except as set forth in subparagraph (d) above, the costs associated with any relocation, removal or reinstallation of the Kiosk made at your request will be at your sole cost and expense (i) if the request is made within the first two (2) years after the Kiosk has been initially installed at the Site, or (ii) within two (2) years after any prior relocation, removal or reinstallation of the Kiosk made at your request.

(f) Your responsibility for the costs associated with a relocation, removal or reinstallation of the Kiosk include Redbox's personnel and equipment costs as well as the relocation of the utility lines, which include any communication lines (DSL or otherwise), electrical lines and any other necessary utilities to the Kiosk.

(g) If the parties mutually agree that relocation of a Kiosk will enhance the financial performance of the Kiosk, then Redbox will bear the costs associated with that relocation.

**6.3 Disclaimer of Liability.** We are not liable, and disclaim all assumption of loss, for any damages, personal or otherwise, should you or any of your agents take it upon themselves to relocate, remove, or re-install a Kiosk. If you move a Kiosk without following the procedures set forth in Section 6.2, you will defend and indemnify Redbox for any Claims that result from the unauthorized movement according to the provisions of Section 12 ("Indemnification") below. We also may offset your Commission for any damages we incur. If you move a Kiosk a second time at a Site without following the procedures set forth in this Section 6.3, we may immediately terminate this contract with respect

150115

to that Site.

**6.4     Remodels and Rebuilds.** Should your operations continue during any period of remodeling or rebuilding of a Site, reasonable accommodations will be made to attempt to keep the Kiosk operating at the Site during that period. However, we may remove a Kiosk or suspend service at a Kiosk during that period if, in our reasonable opinion, the remodeling or rebuilding would have a material adverse effect upon (a) the number of customer transactions conducted at the Kiosk or (b) the Kiosk's condition.

**6.5     Vandalism or Burglary.** Either party may request approval of the other party for the exclusion of any Site from these obligations if the Kiosk has repeatedly been vandalized or burglarized. The other party's approval of this request will not be unreasonably withheld, conditioned or delayed.

**6.6     Removal for Failure to Generate Income.** If a Kiosk fails to generate average net rental revenue in excess of five hundred dollars ($500.00) per week for any four (4) consecutive weeks occurring sixteen (16) weeks or more after the initial installation of a Kiosk at the Site, we may remove the Kiosk at Redbox's sole cost and expense. Net rental revenue is calculated according to Section 7.4(b) ("Commission Calculation and Payment") below. Upon removal of the Kiosk, this contract automatically terminates with respect to that Site. Notwithstanding the foregoing, it is within our sole discretion to remove a second Kiosk from a Site for any reason.

**6.7     Surrender of Premises; Transitional Operation.** Upon the expiration or the termination of this contract, in whole or with respect to any individual Site, we will (a) remove the Kiosks at our sole cost and expense, (b) surrender possession of the Premises, and (c) return the Premises in good clean condition, subject to normal and reasonable wear and tear related to the installation, use, operation and removal of the Kiosks. We will consult with you to mutually agree upon a reasonable schedule to accomplish these tasks, which should not exceed thirty (30) days from expiration or termination. Unless we terminate this contract for your breach, we will continue to operate the Kiosks and pay you commissions upon the same terms and conditions until removal of the Kiosks is complete.

## 7.     Commission Payments

**7.1     Rental Commissions.** We offer Media in the Kiosks for rental by end-customers. We will pay you a commission based on a percentage of net revenue received by Redbox from both the rental of Media and from the failure by customers to return Media, as detailed in Section 7.4 below. The Commission percentage is specified on the Summary Page.

**7.2     Sell Through Commissions.** We may offer new Media for direct sale from the Kiosks. We will pay you a commission based on a percentage of the net revenue received by Redbox for the sale of new Media as detailed in Section 7.4 below. Redbox will determine the sale price of the Media. The sell through commission percentage is specified on the Summary Page.

**7.3     Previously-Viewed Sell Through Commissions.** We may offer previously-viewed Media for direct sale from the Kiosks. We will pay you a commission based on a percentage of the net revenue received by Redbox for the sale of previously viewed Media as detailed in Section 7.4 below. We reserve the right to determine the selection and pricing for previously-viewed Media. The previously-viewed sell through commission percentage is specified on the Summary Page.

**7.4     Commission Calculation and Payment.** For all Kiosks installed and operating at the Sites, we will pay you your commissions within twenty (20) days of the end of each calendar month. Commission payments will:

(a)     be calculated in accordance with generally accepted accounting principles;

(b)     include all gross revenues from paid rentals or sales of Media (as the case may be) and from the failure by customers to return rented Media, less customer refunds, credit card charge backs, declined transactions, promotional discounts, rental taxes and sales taxes; and

(c)     be accompanied by a report which itemizes revenue by Kiosk and Site.

**7.5     Inspection of Records.** It is your right, within one hundred eighty (180) days of payment of a commission, to inspect our accounts and reports relating to the calculation of that commission. Inspections can occur at reasonable intervals upon reasonable advance written notice, and during our regular business hours.

**7.6     Taxes.** Redbox will collect and pay all sales, use or similar taxes levied on revenue generated from the operation of, or personal property taxes, or ad valorem taxes on, the Kiosks. Each party will be responsible for the payment of any income taxes based upon any revenue it may receive under this contract. For further clarity, Redbox will have no liability to separately reimburse Client for any gross receipts, business and occupation, value added, rental, sales and use tax on amounts paid by Redbox to Client under this contract.

## 8.     Marketing

Recognizing that marketing is critically important to increasing customer awareness, which in turn substantially impacts revenue, the parties agree to engage in the following marketing efforts:

**8.1     Location Guide.** You authorize Redbox to use your name and address of the Sites for the purpose of providing a location guide for customers. This guide may be in interactive media form or internet-based, such as but not limited to a locator guide on our website.

**8.2     Banners and Signage.** Through mutual agreement and subject to Site restrictions and/or the approval of individual franchisees, Client will provide Redbox access and permission to place signage at each Client Site. Banners and signage may include:

- Pump toppers (where Client conducts fuel operations)

150115

- Counter displays
- Window clings
- Posters
- A-frames

Signage is subject to the reasonable approval of Client.

**8.3   Your Website.** You will maintain on your corporate website a description of the Redbox products and services offered at your Sites, along with a photo of a Kiosk. The text and photo appearing on this webpage are subject to the mutual approval of the parties. There should be a link to the webpage from some other conspicuous point on your website (e.g., your home page).

**8.4   Press Release.** Upon execution of this contract, the parties will issue a press release announcing their relationship and the installation of Kiosks. The wording of the press release must be approved by both of us. In any printed or published material, each party will be identified by its name and/or logo in accordance with its usual and customary requirements. In so doing, each party will take reasonable measures to protect the other party's name, including without limitation, affixing any appropriate notice of claim to trademark rights.

**8.5   Promotional Codes.** During each year of the Initial Term, and should this contract renew, during the first Renewal Term, Redbox agrees to supply Client with Four Million (4,000,000) 1-day DVD promotional codes free of charge subject to Client utilizing the promotional codes during a minimum of two (2) mutually beneficial promotional events per year. Promotional events will be approved by the parties. Tactics, in support of promotional events, may include:

- Email
- Social
- Signage
- Mobile
- Website
- Media

**8.6   Digital media.** Through mutual agreement, Client and Redbox will commit to using their respective digital assets, including but not limited to SMS, text, e-mail, apps or other software, to deliver promotional offers to customers with a goal to drive Redbox media rentals and sales and to generate customer traffic at Client Sites.

## 9.   Term and Termination

**9.1   Term.**

(a)   This contract goes into effect on the "Effective Date," which is identified on the Summary Page. The term of this contract expires at 11:59 p.m. (Central time) on the date identified on the Summary Page.

(b)   This contract automatically renews for two (2) additional one (1) year periods, each a ("Renewal Term") unless either party gives notice of its intent not to renew this

contract at least ninety (90) days before expiration of the term. During a Renewal Term, either party may terminate this contract without cause upon one hundred twenty (120) days' notice.

**9.2   Termination for Cause.** Either of us may terminate this contract as a result of a material breach by the other party of any of its obligations. The termination will be effective upon the breaching party's receipt of notice of the breach, subject to a thirty (30) business day cure period. If the breaching party fails to cure or to initiate a plan to cure the breach within thirty (30) business days after its receipt of the notice, the non-breaching party may terminate the contract.

**9.3   Immediate Termination.** Notwithstanding the foregoing paragraph, either of us may terminate this contract immediately upon written notice if any of the following events occur: (a) the other party ceases or is likely to cease to carry on all or any principal part of its business; (b) the other party is unable to pay its debts as and when they become due; (c) due to an encumbrance, a third party takes possession of all or any part of the business, property or asset of the other party, or any liquidator or receiver is appointed in respect thereof; (d) the other party makes a general assignment for the benefit of its creditors; or (e) any order has been made or any resolution has been passed for the winding up of the other party.

## 10.   Confidential Information

**10.1   Definition of "Confidential Information."** "Confidential Information" means information, whether received before or after the Effective Date, marked or otherwise identified in writing by one of us as proprietary or confidential, or information that, under the circumstances surrounding the disclosure, the receiving party reasonably should recognize as being confidential. It includes non-public information regarding either party's products, software, marketing or promotions, business methods, cost information, forecasts, sales, revenues, profits, customer information (including personally identifiable information, rental transactions, and rental history), supplier information, and the terms of this contract.

**10.2   Information Not Considered Confidential.** Confidential Information does not include information which: (a) the recipient developed independently; (b) the recipient knew before receiving it from the other party; or (c) is or subsequently becomes publicly available or is received from another source, in both cases other than by a breach of an obligation of confidentiality. The burden of proof to establish that one of the above exceptions applies will be upon the recipient.

**10.3   Use of Confidential Information.** For a period of three (3) years after initial disclosure, neither party will:

(a)   use the other's Confidential Information without the other's written consent, except in furtherance of this business relationship or as expressly permitted by this contract; or

(b)   disclose the other's Confidential Information, except to

150115

obtain advice from its professional advisors, legal or financial consultants, or if compelled by law (including disclosure necessary or appropriate in filings with the U.S. Securities Exchange Commission) or generally accepted accounting principles, in which case the party compelled to make the disclosure will use its best efforts to give the other party notice of the requirement so that the disclosure can be contested.

**10.4 Protection of Confidential Information.** Each party will take reasonable precautions to safeguard the other party's Confidential Information. Those precautions will be at least as great as the precautions that the other party takes to protect its own Confidential Information. Each party will disclose the other's Confidential Information to its employees, consultants or subcontractors only on a need-to-know basis and subject to the confidentiality obligations imposed here. When Confidential Information is no longer necessary to perform any obligation under this contract, each party will return it to the other party or destroy it at the other's request.

**10.5 Cooperation in the Event of Disclosure.** Each party will immediately notify the other party upon discovery of any unauthorized use or disclosure of Confidential Information, and will help the other party regain possession of the Confidential Information and prevent further unauthorized use or disclosure.

**10.6 Right to Use Feedback.** If one party provides suggestions for changes or improvements, or other feedback, to the other party about the other party's products or services, the party receiving the feedback may use it for any purpose without obligation of any kind, except that the receiving party will not disclose the source of feedback without the consent of the party providing it.

## 11. Assumption of Loss; Insurance

**11.1 Assumption of Loss.** Except as otherwise stated in this contract and except for the intentional or grossly negligent acts of you, your employees or agents, we will assume responsibility for all physical loss or damage to our Kiosks, their contents, signs and other personal property, as well as for injuries or damages occurring during and related to their installation.

**11.2 Insurance.** Redbox, at its own expense, shall provide and maintain insurance during the Term of this Agreement, and for a period of one (1) year thereafter, as follows:

(a) Statutory Workers' Compensation coverage for all of its employees, including occupational disease coverage, as required by applicable law, and employer's liability with limits of at least $500,000 bodily injury each accident, $500,000 bodily injury by disease each employee and $500,000 bodily injury by disease in the aggregate. The policy shall be endorsed to include "all states" coverage

(b) Liability insurance (excluding automobile liability) written on an "occurrence" basis with a combined single limit of at least $2,000,000 per occurrence, and $5,000,000 aggregate for bodily injury and property damage in a form

providing coverage not less than a standard commercial general liability policy including hazards of operation coverage, products/completed operations coverage and contractual coverage and an umbrella liability policy with limits of at least $10,000,000. The products liability policy shall name 7-Eleven as an additional insured.

(c). Automobile Liability including protection for automobiles and trucks used by Redbox either on or away from the site at which its services are provided, with a combined single limit of at least $1,000,000 per occurrence for bodily injury and property damage. The policy shall include coverage for all hired, owned and non-owned vehicles.

(d). "All risk" property coverage on all tools and equipment, including rental equipment, used in the execution of the services, for which Redbox may self-insure. If Redbox elects to self-insure, Redbox shall protect you to the same extent as it would if it had an all risk property coverage policy.

(e) Redbox shall furnish you with satisfactory evidence of the required insurance at least 5 days prior to the effective date hereof. Each policy shall include a provision requiring that at least thirty (30) days prior written notice be given you in the event of cancellation. Premiums on all insurance policies shall be paid by Redbox.

(f) All such insurance provided herein shall be primary insurance with respect to the operations and negligence of Redbox. For purposes of this Section, the term 7-Eleven shall include its subsidiaries, agents, employees, invitees, franchisees, contractors, insurance companies and underwriters. Although Redbox is required to obtain and maintain insurance as set forth herein, Redbox's liability under this Agreement shall not be limited in any manner as a result of such insurance

(g) The insurance obligations under this contract shall survive the expiration or termination of this Agreement.

**11.3 Claims Cooperation.** You agree to (a) promptly notify Redbox in writing of any claim or loss after any potentially insurable loss is discovered, and (b) cooperate in the investigation and adjustment of any such loss.

## 12. Indemnification

**12.1 Indemnification of 7-Eleven.** We will defend, indemnify, pay and hold harmless you, your parent companies, affiliates and subsidiary companies, and their respective officers, directors, and employees against any third-party claims, actions, damages, losses, and expenses (including court costs and reasonable attorneys' fees) arising from or incident to: (a) any death, personal injury or damage to tangible property to the extent such death, injury or damage results from our negligence or willful misconduct including that of our subcontractors with respect to the installation, operation, maintenance and repair of the Kiosks or as to the Media; (b) any liability of any nature or kind for or on account of any allegation or finding of a violation of any U.S. patent, trademark, copyright or contractual or other rights of any third parties arising from the purchase, use or

150115

sale by you or the Sites of any Redbox products or services; and (c) from any consumer complaint, claim or legal action whatsoever, alleging damages, death, illness or injury to the extent that is due, in whole or in part, to our actions, omissions, negligence, or gross negligence. Our obligations in this Section are contingent upon: (x) you providing Redbox with prompt written notice of such third-party allegations; (y) you providing reasonable cooperation to Redbox in the defense and settlement of any claim arising from such allegations, at our expense; and (z) Redbox having sole authority to defend or settle any such claim. In the defense or settlement of any intellectual property infringement claim, we may obtain for you the right to continue to locate the Kiosks at the Sites, replace or modify the Kiosks so that they becomes non-infringing, or, if such remedies are not reasonably available, terminate this contract. THE FOREGOING STATES THE ENTIRE OBLIGATION OF REDBOX, ITS LICENSORS AND SUPPLIERS WITH RESPECT TO INFRINGEMENT, MISAPPROPRIATION, OR VIOLATION OF INTELLECTUAL PROPERTY RIGHTS. We have no liability under this contract to the extent that any third-party allegations are based on use of the Kiosks in combination with any third-party products or services or in a manner that violates this contract or the instructions given to you by Redbox.

**12.2    Indemnification by You.** You will defend, indemnify, pay and hold harmless Redbox, its parent companies, affiliates and subsidiary companies, and their respective officers, directors, and employees against any third-party claims, actions, damages, losses, and expenses (including court costs and reasonable attorneys' fees) arising from or incident to: (a) any death, personal injury or damage to tangible property to the extent such death, injury or damage results solely from your negligence or willful misconduct including that of your subcontractors; and (b) the assertion by any landlord or property manager that we do not have the right to install or operate a Kiosk at a company owned Site.

## 13.   Limitations of Liability

**13.1    Limitation of Liability.** NEITHER PARTY IS LIABLE FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, ECONOMIC OR PUNITIVE DAMAGES WHATSOEVER (INCLUDING BUT NOT LIMITED TO DAMAGES FOR LOSS OF BUSINESS OR PERSONAL PROFITS, BUSINESS INTERRUPTION, LOSS OF BUSINESS OR PERSONAL OR CONFIDENTIAL INFORMATION, OR ANY OTHER PECUNIARY LOSS, DAMAGES FOR LOSS OF PRIVACY, OR FOR FAILURE TO MEET ANY DUTY, INCLUDING ANY DUTY OF GOOD FAITH OR TO EXERCISE COMMERCIALLY REASONABLE CARE OR FOR NEGLIGENCE) ARISING OUT OF OR IN ANY WAY RELATED TO THE KIOSKS OR THIS CONTRACT, EVEN IF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THIS LIMITATION WILL BE EFFECTIVE EVEN IF ANY REMEDY FAILS OF ITS ESSENTIAL PURPOSE.

**13.2    Exclusions to the Limitation of Liability.** The limitations of liability in the preceding paragraph will not apply to liabilities arising under the Sections governing

"Confidential Information," "Indemnification," to bodily injury or wrongful death arising from its negligence, to acts or omissions involving a party's gross or intentional misconduct or fraud, or top such other misconduct that cannot be excluded by applicable law.

**13.3    Disclaimer of Warranties.** EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS CONTRACT, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES, AND EXPRESSLY DISCLAIMS ALL WARRANTIES, EXPRESS, IMPLIED, STATUTORY, OR OTHERWISE, RELATING TO OR ARISING OUT OF THIS CONTRACT, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF NON-INFRINGEMENT, ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND IMPLIED WARRANTIES ARISING FROM COURSE OF DEALING OR COURSE OF PERFORMANCE.

## 14.   Miscellaneous

**14.1    Notices.** Notices, authorizations, and requests in connection with this contract must be sent by personal delivery, certified mail (return receipt requested), or express courier to the addresses listed in this contract. Notices will be treated as delivered on the date shown on the return receipt or on the courier confirmation of delivery. Notices sent to Redbox must be separately copied and sent to the "Legal Department."

**14.2    Governing Law.** The laws of the State of Texas, excluding the rules of conflicts of law, will govern this contract.

**14.3    Dispute resolution.** When bringing an action to enforce this contract, the parties agree to the following jurisdictions: (a) if we bring the action, the jurisdiction will be where you have your headquarters; and (b) if you bring an action, the jurisdiction will be Cook County (Chicago), Illinois.

**14.4    Jury Waiver.** Each party knowingly, voluntarily and intentionally waives the right it may have to a trial by jury in respect of any litigation based upon this contract, or arising out of, under or in connection with this contract, or any course of dealing, statements, whether verbal or written, or action of or by a party or any of their respective affiliates to the fullest extent permitted by law. This provision is a material inducement for the parties to enter into this contract.

**14.5    Independent Contractors.** Redbox acts as an independent contractor, and will be responsible for any and all social security, unemployment, workers' compensation and other withholding taxes for all of its employees. Nothing in this contract will be deemed to establish a partnership, joint venture, employment, agency or other legal relationship other than that of independent contractors.

**14.6    Subcontracting.** We may subcontract certain of our obligations under this contract, including but not limited to, installation, maintenance, supplying, servicing, relocation or removal of our Kiosks. However, we will remain primarily liable to you for any and all such subcontracted services.

**14.7    Assignment.** This contract cannot be assigned

150115

without the express written consent of the other, which consent will not be unreasonably withheld, conditioned or delayed. However, a party may withhold consent if an assignee is in or plans to be in competition with that party. Additionally, a party does not need to obtain the consent of the other party to assign this contract to a parent, subsidiary, or affiliated corporation or to a corporation or entity, which acquires all or, substantially all of the assets or stock of such party, parent, subsidiary or affiliate.

**14.8    Entire Agreement.** This contract and all exhibits contain the entire agreement between the parties with respect to the subject matter of this contract, and supersede any previous understandings or agreements, whether written or oral, in respect of such subject matter. However, if this contract does not include a section governing the confidential nature of information exchanged by the parties, then the terms of any separate confidentiality or nondisclosure agreement signed by the parties will not be superseded by this contract.

**14.9    Interpretation.** If a court holds any provision of this agreement to be illegal, invalid or unenforceable, the rest of the document will remain in effect and this agreement will be amended to give effect to the eliminated provision to the maximum extent possible. The term "may" indicates that something is permissive and optional in a party's discretion, not mandatory or automatic. The language used in this contract has been mutually chosen by the parties to express their intent, and no rule of strict construction will be used against either party.

**14.10    Modification; Waiver.** No amendment, change, waiver or discharge of this contract is valid unless it is set forth in writing and signed by an authorized representative of the party (which in the case of Redbox is a Vice President)

against whom the amendment, change, waiver or discharge is sought to be enforced.

**14.11    Third Party Beneficiaries.** There are no third-party beneficiaries who are intended to benefit in any way from this contract.

**14.12    Force Majeure.** Neither of us will be liable to each other for any loss, damage, delay or failure of performance that is attributable to acts of God, armed conflicts, war, insurrection, acts of terrorism or acts committed in furtherance of terrorism, riots, earthquakes, hurricanes, floods, unusually severe weather, conditions or events of nature that cannot be predicted, civil disturbances, power or communications failures, strikes, fire, the acts of any governmental authority, or other causes beyond a party's reasonable control. A party's performance will be excused during the pendency of any such event, but that party will take all steps reasonable, practical and necessary to effect prompt resumption of its obligations under this contract in full or in part.

**14.13    Survival.** Provisions regarding payment of commissions, limitations of liability, confidentiality, indemnification, obligations on termination or expiration and the other provisions in this Section entitled "Miscellaneous" survive termination or expiration of this contract.

**14.14    Execution.** This contract is effective when it is signed in "pen and ink" by authorized representatives of each party. The contract may be executed in one or more counterparts, each of which will constitute an original agreement, but is not enforceable until delivery and exchange of the executed counterparts. Copies of this contract (including facsimiles) have the same force and effect as a signed original document.

**7-ELEVEN, INC.**

By: _Jesus Delgado Jenkins_

Name: _JESUS DELGADO-JENKINS_

Title: _EVP + CHIEF MERCH. OFFICER_

Date: _JAN 27, 2015_

**REDBOX AUTOMATED RETAIL, LLC**

By: _[signature]_

Name: _TARYN ARONSON_

Title: _VP - FINANCE_

Date: _1-15-15_

150115

## EXHIBIT A

## Redbox Physical/Technology Overview

### Physical Specifications



150115



1. **Electricity Connection**
   a. **Interior Kiosk**
      1. Power – 120v. 20 amp dedicated electric line
      2. The light box and the header that sits on top of the machine have a total electric load of 1.2 amps. The machine has a total electric load of 4.9 amps for a total connected load of 6.1 amps.
   b. **Exterior Kiosk**
      1. Power: 20 Amp dedicated circuit
      2. The light box and the header that sits on top of the machine have a total electric load of 2.1 amps. The machine has a total electric load of 8.5 amps for a total connected load of 10.6 amps.

150115

## EXHIBIT B

### SITE LIST

| Store # | Banner | Address | City | State | Zipcode |
|---------|--------|---------|------|-------|---------|
| 10009 | 7-Eleven, Inc. | 30 N Summerlin Ave | Orlando | FL | 32801-2930 |
| 10017 | 7-Eleven, Inc. | 3608 Aloma Ave | Winter Park | FL | 32792-4004 |
| 10022 | 7-Eleven, Inc. | 2609 Delaney Ave | Orlando | FL | 32806-4527 |
| 10060 | 7-Eleven, Inc. | 401 W State Road 436 | Altamonte Springs | FL | 32714-4135 |
| 10114 | 7-Eleven, Inc. | 1500 Garden St | Titusville | FL | 32796-3315 |
| 10249 | 7-Eleven, Inc. | 6205 Gulf Blvd | St Pete Beach | FL | 33706-3715 |
| 10253 | 7-Eleven, Inc. | 403 Clearwater Largo Rd N | Largo | FL | 33770-2345 |
| 10349 | 7-Eleven, Inc. | 10815 N Nebraska Ave | Tampa | FL | 33612-6816 |
| 10386 | 7-Eleven, Inc. | 1976 43rd Ave | Vero Beach | FL | 32960-0519 |
| 10389 | 7-Eleven, Inc. | 3110 Oleander Ave | Fort Pierce | FL | 34982-6424 |
| 10641 | 7-Eleven, Inc. | 10601 Lomond Dr | Manassas | VA | 20109-2808 |
| 10643 | 7-Eleven, Inc. | 10008 Main St | Fairfax | VA | 22031-3404 |
| 10653 | 7-Eleven, Inc. | 701 Van Buren St | Herndon | VA | 20170-4656 |
| 10654 | 7-Eleven, Inc. | 7420 Old Centreville Rd | Manassas | VA | 20111-1642 |
| 10657 | 7-Eleven, Inc. | 1111 Elden St | Herndon | VA | 20170-5502 |
| 10663 | 7-Eleven, Inc. | 868 E Washington St | Charles Town | WV | 25414-1086 |
| 10677 | 7-Eleven, Inc. | 3019 Annandale Rd | Falls Church | VA | 22042-3003 |
| 10678 | 7-Eleven, Inc. | 7222 Arlington Blvd | Falls Church | VA | 22042-1829 |
| 10689 | 7-Eleven, Inc. | 3338 Gallows Rd | Annandale | VA | 22003-1201 |
| 10691 | 7-Eleven, Inc. | 7451 Patterson Rd | Falls Church | VA | 22043-1332 |
| 10693 | 7-Eleven, Inc. | 8616 Park St | Vienna | VA | 22180-6842 |
| 10697 | 7-Eleven, Inc. | 2242 Gallows Rd | Dunn Loring | VA | 22027-1136 |
| 10698 | 7-Eleven, Inc. | 4131 Hummer Rd | Annandale | VA | 22003-2416 |
| 10701 | 7-Eleven, Inc. | 7822 Rectory Ln | Annandale | VA | 22003-4935 |
| 10717 | 7-Eleven, Inc. | 1131 S George Mason Dr | Arlington | VA | 22204-3801 |
| 10721 | 7-Eleven, Inc. | 3337 Glen Carlyn Dr | Falls Church | VA | 22041-3314 |
| 10722 | 7-Eleven, Inc. | 3011 Patrick Henry Dr | Falls Church | VA | 22044-2521 |
| 10735 | 7-Eleven, Inc. | 3420 Carlin Springs Rd | Falls Church | VA | 22041-2803 |
| 10741 | 7-Eleven, Inc. | 2704 Washington Blvd | Arlington | VA | 22201-1939 |
| 10751 | 7-Eleven, Inc. | 3100 Lockheed Blvd | Alexandria | VA | 22306-2001 |
| 10753 | 7-Eleven, Inc. | 2901 Arlington Dr | Alexandria | VA | 22306-2325 |
| 10756 | 7-Eleven, Inc. | 14820 Cloverdale Rd | Dale City | VA | 22193-1760 |
| 10761 | 7-Eleven, Inc. | 8434 Frye Rd | Alexandria | VA | 22309-8426 |
| 10763 | 7-Eleven, Inc. | 6147 Franconia Rd | Alexandria | VA | 22310-2508 |
| 10767 | 7-Eleven, Inc. | 13304 Occoquan Rd | Woodbridge | VA | 22191-1008 |
| 10768 | 7-Eleven, Inc. | 2405 Fairhaven Ave | Alexandria | VA | 22303-2301 |
| 10772 | 7-Eleven, Inc. | 6946 S Kings Hwy | Alexandria | VA | 22310-3331 |
| 10773 | 7-Eleven, Inc. | 2800 Beacon Hill Rd | Alexandria | VA | 22306-1614 |

150115

**Exhibit C**

**Installation Guidelines**

*Unit Placement Guidelines*

1. The Redbox is placed at the storefront against the wall. However, the unit shall not block the storefront window. See below:



2. The electricity outlet should not be mounted on the mullion. . Shown below is a totally unacceptable installation.



3. Redbox must be 10' away from propane per fire code.

4. Conduit should be through the wall at 16" AFF and concealed to customer

5. For existing stores, electrician must perform Circuit Breaker Load Distribution Balance.

6. Use Circuit breaker Panel "S" as primary power source

7. Disconnect unit size should not exceed (6 ½" h X 4"w X 3 ½" d) - Square -D MD # QO200TR G03 Series 20 Amp or equal -- wall mounted unit

*General Requirements to Comply with ADA Requirements for Redbox*

1. ADA accessibility on sidewalk - Must have 60" turnaround space in front of the Redbox kiosk or to the left or right for ADA requirements.

150115

2. Minimum sidewalk depth for Redbox is 6'.(7' in CA and Denver)

3. Sidewalks (with curbs) between 6' and 8' require a protective barrier (curb stops or bollards) to keep cars from overhanging the sidewalk and obstructing the path in front of the Redbox if there is head on parking in front of the sidewalk.  Sidewalks greater than 8' do not require protective barriers.

   a. If curbstops are used with a 6' sidewalk, they need to be placed at least 2' back of the curb.

   b. If curbstops are used with a 7' sidewalk, they need to be placed at least 1' back of the curb.

   c. If bollards are used, they should be placed just past the curb in the parking lot, not on the sidewalk.

4. With stores that have no curbs, bollards (4" dia. Loop) are required and must be at least 8' from the store wall with 36" spacing between them.  The spacing accommodates the ADA rule, while the bollard placement protects the customer renting at the Redbox.  Use the anchoring details shown below.



5. Height clearance of the exterior Redbox is 96" – or 8'.  Length of the Redbox is 6'.  Need 7' of space to accommodate the outlet and disconnect box left or right of the Redbox.

6. Maximum allowed sidewalk slope is 1 ½" over 6' for several reasons...

   a. ADA requirements

150115

   b. Allows the Redbox to be properly secured to the sidewalk

7. Exterior kiosks are bolted to the sidewalks.  Sidewalk material must be concrete in order to properly secure the Redbox kiosks.

8. Redbox is not responsible for installation or the costs associated with the installation of:  (a) bollards; (b) curb stops; or (c) any form of protective barriers as described in paragraphs 3 and 4 above.


**Any exceptions should be approved via the "Exception Request" process.  The Exception Requests are submitted to Ben.Rajabi@7-11.com.**

**Kiosks installed prior to the Effective Date of this contract are not required to meet the Installation Guidelines of this Exhibit C.**

**To the extent that the installation guidelines as set forth in this Exhibit C conflict with the terms and conditions of the contract, the terms and conditions of the contract will control.**



**EXHIBIT A**

### KIOSK OPERATING AGREEMENT
### Summary Page

| | |
|---|---|
| **Client:** | 7-Eleven, Inc. |
| **Primary Client Contact:** | Mark Hagen; mark.hagen@7-11.com; 972-828-7747 |
| **Form of Organization:** | A corporation organized under the laws of the state of Texas |

**Client Addresses:**    *Principal Address*                    *For Notices*:

7-Eleven, Inc.                    Same
1722 Routh Street
Suite 1000
Dallas, Texas 75204

| | |
|---|---|
| **Effective Date:** | January 1, 2019 |
| **Term:** | 3 years beginning on January 1, 2019 and expiring on December 31, 2021. Thereafter, this contract will renew for up to two (2) additional one (1) year periods unless either party gives notice of non-renewal. |

**Placements:**    ☒ Indoor                    ☒ Outdoor

**Commission:**    10.75% per Kiosk for DVD rental; 8.5% per Kiosk for video game rental; 3% per Kiosk for Sell Through and Previously viewed Sell Through. Commission payment is calculated in accordance with Section 7.

**Products:**
☒ Movie Rental
☒ Movie Sell Through
☒ Movie Previously-Viewed Sell Through
☒ Video Game Rental
☒ Video Game Sell Through
☒ Video Game Previously-Viewed Sell Through

| | |
|---|---|
| **Issuance of Commission Payments:** | Monthly, Net 30 |
| **Cancellation of Prior Contracts:** | This contract, on and after its Effective Date, supersedes and cancels the prior contracts (except with respect to any outstanding payment obligations) identified as follows:

N/A. |

3



## FIRST AMENDMENT TO
## KIOSK OPERATING AGREEMENT

This First Amendment to Kiosk Operating Agreement ("**First Amendment**") is between 7-Eleven, Inc., a Texas corporation ("**Client**") and Redbox Automated Retail, LLC, a Delaware limited liability company ("**Redbox**") (**collectively, the "Parties"**).

Client and Redbox entered into a Kiosk Operating Agreement effective January 1, 2015 (the "**Operating Agreement**") granting Redbox the right to install and operate automated media rental and sales machines, and to rent media at Client Sites.

Client and Redbox now desire to amend the Operating Agreement on the terms and conditions below.

THEREFORE, Client and Redbox agree that effective January 1, 2019 the Operating Agreement is amended as follows:

1.      Beginning on the Summary Page and throughout the contract, all references to "DVD" are deleted and replaced by the word "movie".

2.      The definition of "Media" is deleted in its entirety and redefined as follows:

"**Media**" means movies and video games.

3.      Commission Payments, as set forth in Section 7.4, will be paid within thirty (30) days of the end of each calendar month.

4.      Section 7.6 Taxes, is deleted in its entirety and restated as follows:

**7.6     Taxes**

(a)      Redbox shall ensure compliance with all federal, state and local tax laws applicable to the Kiosks, Media and services including but not limited to registering to pay, collecting and remitting taxes imposed upon Redbox in performance of its obligations under this contract. Each party shall be solely responsible for any taxes owed on its income, gross receipts, property or net worth, including income generated under this contract. Redbox will have no liability to separately reimburse Client for any income, gross receipts, business and occupation, or similar tax imposed on Client's business, income, or receipts for any amount paid to Client by Redbox as a result of this contract or any Kiosk transactions.

(b)      In the event that the tax authorities subsequently seek to assess taxes against Client that Client reasonably believes are Redbox's obligation, then Client, rather than remit such taxes and seek reimbursement from Redbox,  shall immediately provide written notice to Redbox, and Redbox and Client shall reasonably cooperate with each other to investigate and accurately determine the appropriate tax liability, if any, and work together to minimize such tax liability, to the extent legally permissible.  Notwithstanding the indemnification provision set forth below,  if the Parties, exercising good faith, determine that the assessed taxes, or some portion thereof, is properly due and payable by Redbox, Redbox shall pay such taxes, and in such a case, Redbox shall bear all interest, levies and penalties, assessed by such tax authorities as required by applicable Law, unless the failure to collect and remit taxes is attributable to a Client misrepresentation or failure to disclose a material fact that affects the imposition of taxes due.

(c)      The Parties shall provide prompt notice to one another of any audit by tax authorities with respect to Taxes, and shall reasonably cooperate to identify and defend positions that may arise under such an audit.

1



5.     Upon expiration of the second Renewal Term, the Operating Agreement shall automatically renew for a three (3) year period expiring on December 31, 2021 (the "**Third Renewal Term**"). Thereafter, the Operating Agreement renews for up to two (2) additional one (1) year periods (the "**Fourth and Fifth Renewal Term**"), unless one of us gives the other written notice that the contract will expire at the end of the Third or Fourth Renewal Term. This notice must be given and received at least ninety (90) days and not more than one hundred eighty (180) days prior to the end of the Third or Fourth Renewal Term. During the Fourth or Fifth Renewal Term, either party may terminate the Operating Agreement without cause upon one hundred twenty (120) days' notice.

6.     Section 8.5, Promotional Codes, is deleted in its entirety.

7.     Upon execution of this First Amendment, the Summary Page is modified as shown in Exhibit A attached hereto and incorporated herein.

Except for the provisions set forth above, all other terms and conditions contained within the Operating Agreement remain unchanged.

**THIS FIRST AMENDMENT, INCLUDING THE OPERATING AGREEMENT OF WHICH IT IS A PART, IS A COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT**
**BETWEEN THE PARTIES, WHICH SUPERSEDES ALL PRIOR OR CONCURRENT PROPOSALS AND UNDERSTANDINGS, WHETHER ORAL OR WRITTEN, AND ALL OTHER COMMUNICATIONS BETWEEN THE PARTIES, RELATING TO THE SUBJECT MATTER OF THIS FIRST AMENDMENT AND THE OPERATING AGREEMENT.**

Notwithstanding anything to the contrary in the Operating Agreement, in the event of a conflict between the terms and conditions of this First Amendment and those contained within the Operating Agreement, the terms and conditions of this First Amendment shall prevail. ALL OTHER TERMS AND CONDITIONS REMAIN UNCHANGED AND ARE RATIFIED HEREBY.

IN WITNESS WHEREOF, Client and Redbox, by their execution below, indicate their consent to the terms of this First Amendment.

**7-ELEVEN, INC.**                                    **REDBOX AUTOMATED RETAIL, LLC**

By: _____          By: _____

Name: _Jack Stout_____          Name: _____

Title: _SVP Merchandising_____          Title: _____

Date: _9/25/18_____          Date: _____

Michael Coffman, Assistant Secretary

Date: _9/4/18_____

2